UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HAMZA DRIDI, | ) |
| Petitioner, | ) ) ) |
| v. | ) No. 1:21-cv-00666-JMS-MG |
| UNITED STATES OF AMERICA, | ) ) ) |
| Respondent. | ) ) |

**Order Discussing Motion for Relief Pursuant to 28 U.S.C. § 2255
and Denying Certificate of Appealability**

For the reasons explained in this Entry, the motion of Hamza Dridi for relief pursuant to 28 U.S.C. § 2255 must be **denied** and the action dismissed with prejudice. In addition, the Court finds that a certificate of appealability should not issue.

### I. The § 2255 Motion

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II. Factual Background

The facts of Dridi's crime, as summarized by the Seventh Circuit on his direct appeal, are as follows.

> Mahammad Hindi and Mohamed Mahmoud co-owned two car dealerships in Indianapolis: Elite Imports and Elite Car Imports (collectively "Elite Imports"). By 2012, Elite Imports's employees were engaged in a variety of illegal schemes intended to defraud lenders and insurance companies.
>
> A.  *Fraudulent Schemes*
>
> Before acquiring cars for resale, Elite Imports needed to obtain financing from floor-plan lenders.  Floor-plan lenders provide loans to dealerships like Elite, enabling them to buy cars in bulk. In exchange for these loans, a dealership agrees that, shortly after a car is sold, the dealership will pay the floor-plan lender the amount borrowed for that car. To ensure payment, floor-plan lenders hold on to the title of each car, and only release the title to a dealership once the floor-plan lender receives payment for the car. Floor-plan lenders also send auditors to a dealership's car lot to make sure the dealership is not selling cars without repaying the loan after each sale.
>
> However, Elite Import's employees found a way around acquiring a car's title from floor-plan lenders: lying. Instead of seeking the original title from the floor-plan lender, an Elite Imports employee would obtain a copy of the car's title from the Indiana Bureau of Motor Vehicle's online portal. If a copy of the title could not be acquired, employees could still avoid asking floor-plan lenders to release the car's title—by continually issuing the customer temporary license plates.
>
> To prevent this scheme from being detected by floor-plan lenders and their auditors, Elite Imports's employees would call customers and request that their cars be returned to the lot for a VIN number inspection or a free oil change. The customers who obliged would return their cards to the lot before an auditor's inspection. If a car could not be returned, employees would simply lie to the auditor, saying that the car was not on the lot due to a test drive or repairs.
>
> In the end, this multi-layered scheme allowed Elite Imports to sell cars without repaying floor-plan lenders.
>
> Elite Imports's employees also defrauded consumer lenders. Sometimes, employees would be approached by customers who could not afford a car without a loan and did not qualify for a consumer loan. To sell to these customers, employees helped the customer submit fraudulent applications to consumer lenders.

Employees would create fake bank statements, driver's licenses, and social security cards for the customers to send to their lenders. Multiple customers used these fraudulent documents to obtain financing for a car purchase. When the loan was approved, the lenders paid Elite Imports the price of the vehicle, shifting all risk of loan non-payment to the consumer lenders, who were often never repaid by the customer.

In a final scheme, Elite Imports's employees used the dealership's resources to defraud insurance companies for their own financial gain. Multiple employees used a chop shop located behind the dealership to disassemble their own vehicles. The employees would then report their vehicles as stolen to law enforcement agencies and insurance companies. Employees even directed customers to file similarly fraudulent insurance claims. The employee or the customer would then receive insurance proceeds on the reportedly stolen car.

B.  Dridi's Involvement

The parties dispute the exact time Dridi began working for Elite Imports. The government claims Dridi started in late 2012 or early 2013; Dridi claims it was late 2013 but testified at trial that he did not remember the exact date. Although the record does not pin down exactly when Dridi began working there, it does reveal his employment began in or before May 2013: Pam Tatom, Elite Imports's finance manager, testified that Dridi was already working at Elite Imports by the time she started working there in May 2013.

At some point after Dridi began working for Elite Imports, he participated in various aspects of its fraudulent schemes. For example, Dridi opened an insurance policy on a truck in August 2013. A few months later, he reported the truck stolen and collected $1,600.90 in insurance proceeds.

Looking at another example, by late 2014, Elite Imports had promoted Dridi to service manager, a position in the body shop. In this role, Dridi oversaw the disassembly of multiple vehicles that would later be reported stolen. Specifically, Dridi directed an employee to disassemble a red Ducati motorcycle that belonged to another employee, Mahdi Khelefi. Khelefi then reported the motorcycle stolen, received a check for the proceeds, and endorsed that check to Dridi.

Dridi also participated in Elite Imports's other fraudulent activity. In preparation for an audit by floor-plan lenders, Dridi would call customers to request that they return their cars to the lot; then, he would help clean the car so auditors could not tell the car had been sold. Additionally, Tatom would email Dridi documents to be used in defrauding consumer lenders.

*United States v. Dridi*, 952 F.3d 893, 896-97 (7th Cir. 2020).

In March 2017, Dridi was charged in an eight-count multi-defendant superseding indictment. Crim. Dkt. 70. Dridi was charged with conspiracy to commit racketeer influenced and corrupt organizations, in violation of 18 U.S.C. § 1962(d) (Count 1); and interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 (Count 7). *Id*.

Dridi initially retained Marla Rae Thomas as counsel, but on April 21, 2017, Ms. Thomas filed a motion to withdraw her appearance. Crim. Dkts. 41, 113. The Court granted the motion and appointed Mark Inman to represent Dridi. Crim. Dkts. 121, 125, 127. Following a jury trial in January 2018, a jury found Dridi guilty as charged. Crim. Dkt. 203. On October 24, 2018, the Court imposed a sentence of 72 months' imprisonment, followed by two years of supervised release and restitution in the amount of $1,800,679.25. Crim. Dkt. 261.

Dridi appealed his conviction and sentence, and the Seventh Circuit affirmed his sentence, but vacated his restitution order finding that the evidence did not support the amount Dridi was held liable for and that further proceedings were needed to establish the actual amount of loss caused by Dridi. *See Dridi*, 925 F.3d 901. On remand, the parties agreed that restitution should be amended to $1,733,112.83. Crim. Dkts. 350, 355. On September 26, 2020, the Court entered final judgment for the amended restitution amount. Crim. Dkt. 357.

In March 2021, Dridi filed letters requesting release, and the Court construed these letters as motions pursuant to 28 U.S.C. § 2255 and afforded him the opportunity to withdraw or amend his filings to include all § 2255 claims he wished to allege. *See* dkts. 1, 2, 3. Dridi continued to file multiple letters seeking release. *See* dkts. 6, 8, 11, 12, 13. The Court responded to Dridi's letters in Docket No. 13, stating:

> These filings are extensive and range from providing information about Mr. Dridi's arrival in the United States, dkt. 2-1, to requesting compassionate release, dkt. 6, to alleging that government officials used "some sort of supernatural means that allowed them to have control over [Mr. Dridi's] brain and mind," dkt. 11. The Court has

> reviewed all of Mr. Dridi's filings, and it is unable to identify a non-frivolous legal basis for attacking Mr. Dridi's conviction and sentence.

Dkt. 13 at 1. The Court also granted Dridi an additional opportunity to submit a motion for relief under § 2255. *Id*.

On March 3, 2022, Dridi filed two documents in support of his motion under § 2255, and the Court then issued an order for the United States to show cause. Dkts. 18, 19, 20. On July 21, 2022, the United States filed its return to the Court's show-cause order. Dkt. 31. On April 12, 2023, Dridi filed yet another letter. Dkt. 34. This time, Dridi sought to inform the Court that he has completed his sentence, that he has been released from the custody of the Bureau of Prisons, and that he has been detained by the Office of Immigration and Customs Enforcement ("ICE"). Dkt. 36. Dridi asks that the Court "please grant [him] citizenship so [he] could go home and proceed with [his] life." *Id*.

### III. Discussion

In its return to the Court's show-cause order, the United States argues that Dridi's claims liberally construed, include claims of ineffective assistance of counsel, but that they are underdeveloped and therefore waived. Dkt. 31 at 1. The United States further argues that all of Dridi's remaining claims are procedurally defaulted because they were not raised in the district court or on appeal. *Id*. For the reasons below, the Court agrees.

#### A. Ineffective Assistance of Counsel

Construed liberally, Dridi's motion alleges claims of ineffective assistance of trial counsel. A petitioner claiming ineffective assistance of counsel bears the burden of showing (1) that trial counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94

(1984); *United States v. Jones*, 635 F .3d 909, 915 (7th Cir. 2011). If a petitioner cannot establish one of the *Strickland* prongs, the Court need not consider the other. *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014). To satisfy the first prong of the *Strickland* test, a petitioner must direct the Court to specific acts or omissions of his counsel. *Wyatt v. United States,* 574 F.3d 455, 458 (7th Cir. 2009). The Court must then consider whether in light of all of the circumstances counsel's performance was outside the wide range of professionally competent assistance. *Id.* To satisfy the prejudice component, a petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Here, based on Dridi's failure to specify the alleged deficiencies in his trial counsel's performance or the alleged prejudice it caused him, his claim immediately fails as underdeveloped. *See Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir. 1991) ("Bald allegations of prejudice are insufficient to demonstrate ineffective assistance of counsel."); *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005) (defendant bears the burden of proof and persuasion in establishing an ineffective assistance of counsel claim and "conclusory allegations do not satisfy Strickland's prejudice component"). His underdeveloped claim is therefore waived. *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("we have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (internal quote marks omitted); *United States v. South*, 28 F.3d 619, 629 (7th Cir. 1994). Dridi is not entitled to relief on this ground.

### B. Procedural Defaulted Claims

All of Dridi's remaining claims are procedurally defaulted because he failed to raise them at the trial court or in his appeal. A claim not raised on direct appeal generally may not be raised

for the first time on collateral review and amounts to procedural default. *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016). "To overcome the procedural default and obtain § 2255 relief, [Mr. Dridi] must show either cause for the default and actual prejudice from the alleged error, or that he is actually innocent. . . ." *White v. United States*, 8 F.4th 547, 554 (7th Cir. 2021) (citing *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604 (1998)). Here, Dridi has not provided any evidence to support a claim of actual innocence, and thus, the Court should "restrict its analysis to the cause-and-prejudice standard." *Delatorre*, 847 F.3d at 843.

Here, as the United States correctly points out, Dridi does not attempt to discuss the cause-or-prejudice standard to overcome the procedural default of his claims. Furthermore, based on his most recent letter filed after the United States response brief pointing out the failure of Dridi's claims, Dridi appears to have abandoned any challenges to his sentence and conviction and now seeks only relief that is not available to him in this action, namely United States citizenship. *See* dkt. 36 at 1 (seeking United States citizenship so that he may be released from ICE custody). Accordingly, the Court dismisses any remaining § 2255 claims without further discussion. As the Court explained in its denial of Mr. Dridi's identical motion to grant citizenship filed in his criminal matter, "Congress has prescribed the means of obtaining citizenship, and Mr. Dridi has not fulfilled those obligations." Crim Dkt. 401 at 1 (citing 8 U.S.C. §1401 et seq.; *id*. § 1421(a); *id*. § 1427).

## IV.  Conclusion

For the reasons explained in this Order, Dridi is not entitled to relief on his § 2255 motion. His motion for relief pursuant to § 2255 is **DENIED** and this action is dismissed with prejudice. Judgment consistent with this Entry shall now issue and the Clerk shall **docket a copy of this Entry in No. 1:16-cr-00167-JMS-MJD-4.** The motion to vacate, Crim. Dkt. [375], shall also be **terminated** in the underlying criminal action.

## V. Denial of Certificate of Appealability

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014). Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Dridi has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **denies** a certificate of appealability.

**IT IS SO ORDERED.**

Date: 8/25/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

HAMZA DRIDI
A210 220 844
MIPC
P.O. BOX 560
Trout, LA 71371